(No. 36911.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BISHOP JEFFRIES, Plaintiff in Error.

*Opinion filed November 30, 1962.*

GEORGE KAYE, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and RUDOLPH L. JANEGA and M. ROBERT OSTROW, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

After a trial before a judge of the criminal court of Cook County, the defendant, Bishop Jeffries, was convicted of the offenses of rape and assault with intent to commit robbery. He was sentenced to the penitentiary for

fifteen years on the rape charge, and a concurrent sentence of not less than five nor more than ten years was imposed on the charge of assault with intent to commit robbery. On this writ of error to review both judgments, he asserts that the trial court relied on information outside the record, and that the evidence failed to establish his guilt beyond a reasonable doubt.

The two crimes occurred minutes apart in the same block on Spaulding Avenue in Chicago. The assault case was tried first, and the victim of the rape was allowed to testify for the purpose of placing the defendant at the scene. On the rape trial which followed immediately, the parties stipulated that the evidence heard in the assault case would be considered on trial of the rape case.

Roger Glover testified that he was on his way home from a party at approximately 5:00 A.M., on Sunday morning, February 21, 1960, when he decided to visit his mother who lived at 1607 Spaulding. He left the bus on which he was riding at the corner of 16th Street and Spaulding Avenue and began to walk toward his mother's home. Two men followed him in to the hallway of the building in which his mother lived. One of them, whom he identified as the defendant, said, "If you open your mouth, I'll blow your brains out." As he said this he pointed his coat pocket menacingly at Glover as if it contained a pistol. A struggle ensued. Glover struck the unidentified attacker, and also struck the defendant, and knocked him to the floor. Glover's sister then opened the door to his mother's apartment and the two men fled.

The rape victim testified that she and her husband lived in the same building as Glover's mother and helped with its maintenance. On the morning of February 21 she and her husband were salting the building's walkway preparatory to shoveling the snow that had fallen during the night. Her husband went inside to put on his boots. While he

was gone, three men ran by her and entered the building by the center entrance. Minutes later two men emerged from the same entrance, and approached her. The taller of the two struck her on the forehead and they then took her across the street into the hallway between the first and second floors of an apartment building. The tall man hit her and shoved her down on the stairs. Then the second man, who she identified as the defendant, raped her. They left this building when they heard noises and proceeded to another building a short distance away. On the second floor landing of that building, the defendant again raped her, and performed an unnatural sex act on her person. A woman opened the door of the apartment on the landing, and the defendant fled down the stairs as the tenant closed her door in fright. The taller man then began to beat her but he also fled when a man opened the apartment door. When the police arrived, they took the prosecutrix with them as they searched the area. While one of the policemen was looking under some porches, she and the other policeman saw the defendant walking down the street. She said, "That's the man" and the police officer took the defendant into custody after a struggle. At a police show-up on February 23, Glover identified the defendant as one of the men who assaulted him.

The defendant testified, and denied both the assault and the rape. He explained his presence on the street where he was arrested by stating that he was returning alone from an evening of gambling to his home which was located nearby. The defendant also testified that he was beaten at the time of his arrest and subsequently at the district police station. The hospital records that the defense introduced confirmed his injuries and attributed them to resisting arrest. The two arresting officers, however, denied that they struck the defendant in subduing him. At no time during his detention did the defendant

acknowledge either offense. No other witness testified for the defense.

The defendant asserts that in each case the trial judge reached his decision by relying on matters within his own personal knowledge. In the assault case Glover had testified that he had spent the night at what was called a "quarter party" at which no liquor was served. The defendant's attorney argued that a "quarter party" is one given for the purpose of raising money by dispensing drinks in a private home, and the only inference to be drawn was that Glover was intoxicated after being at the party for many hours. He asked the judge to take into account his personal experience in evaluating Glover's testimony. The judge replied that he had seen many "quarter parties" at political ward organization headquarters at which no liquor was served.

The claim that the judge relied upon his own personal knowledge in the rape case is likewise based on statements made during the closing argument. The defendant was afflicted with a venereal disease, and the prosecutrix had testified that she was examined only once for venereal disease, immediately after the rape, and that the result was negative.

On these facts defense counsel made the following argument:

"Your Honor, this woman was examined for syphilis and was found not to have it. If my defendant had syphilis at this time, which the records substantiate, this woman would have contracted syphilis.

"The Court: It wouldn't show up the first day or immediately after the act."

The defendant claims that there was no basis in the record for the judge's conclusion concerning the manifestation of venereal disease, and that in the absence of medical testimony the trial judge should not have drawn on his own

personal knowledge to reach such a conclusion. It is equally true, of course, that there was no medical testimony to support the conclusion advanced by defense counsel.

We recently considered the extent to which a trial judge may draw on his personal knowledge, or conduct his own independent investigation in *People* v. *Wallenberg*, 24 Ill.2d 350. There the trial judge had explicitly indicated that he did not believe the defendant because of a discrepancy between the defendant's alibi and the judge's own personal knowledge. We said: "A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." 24 Ill.2d at 354.

In both instances involved in the present case, the trial judge's remarks were invited by the argumentative inferences drawn by defendant's attorney. Neither the inference that Glover was intoxicated, nor the inference that the defendant's venereal disease must have been communicated to the prosecutrix, find any support in the record. In the *Wallenberg* case, the personal knowledge of the judge was used to contradict important testimony offered by the defense. The two situations are clearly dissimilar.

The defendant next contends that he was not proved guilty beyond a reasonable doubt. To support this contention he relies first on certain discrepancies in the testimony of the two witnesses regarding the clothing worn by the defendant. Glover testified at one point that the defendant was wearing an overcoat and a cap. The prosecutrix testified that the defendant was wearing a leather jacket. In addition, the defendant contends, Glover testified that the defendant had a gun while the prosecutrix said that she saw no weapon. An examination of the record shows only that Glover said the defendant had his

hand in his coat pocket and appeared to have a gun. He did not state that he ever saw any weapon. Moreover, he stated at one point that he didn't know what his assailant was wearing, and at another that his coat was shorter than an overcoat, so that his over-all identification of the defendant's clothing is imprecise. Glover saw his attackers' faces clearly in the narrow confines of a lighted hallway as he fought with them. The prosecutrix was with the man who raped her and his companion for approximately fifty-five minutes. During that time they walked along the street and were in lighted hallways. There was ample time to fix the defendant's face clearly in her mind. The identifications of both witnesses were unequivocal.

The defendant also contends that the record fails to disclose a prompt complaint by the prosecutrix, but the record rebuts the contention. The prosecutrix testified that she banged on the door of the apartment outside of which she was raped, that she was finally admitted and that she remained there until the police arrived. The fact that the defendant did not strike her is not significant, since she was beaten on three occasions by his companion, and she testified that she did not resist the defendant because of these beatings.

The defendant has also catalogued a number of what he terms "omissions" in the case for the prosecution, in support of his claim that he was not proved guilty beyond a reasonable doubt. The list includes the failure of the State to produce witnesses, such as the prosecutrix's husband and her physician, the occupants of the apartment to which she was admitted, and Glover's relatives. It also includes physical items such as the box containing the salt being put on the walk by the prosecutrix and her husband, her clothing, hospital records regarding her examination and a medical examination of the defendant for signs of recent intercourse. None of these witnesses or items of evidence was essential to the prosecution's case, and on the

record as made we are of the opinion that the trial court properly found that the defendant's guilt was established beyond a reasonable doubt.

Finally, the defendant argues that the record reflects a reliance on prejudice rather than evidence to convict him. This prejudice, he claims, is shown by the fact that a hearing in mitigation and aggravation was conducted prior to the imposition of sentence. Our decisions in *People* v. *Trobiani,* 412 Ill. 235, and *People* v. *Spann,* 20 Ill.2d 338, on which the defendant relies, have no bearing on this case. The defendant was convicted in 1960, and the statute (Ill. Rev. Stat. 1959, chap. 38, par. 801) authorized the judge in bench trial upon a plea of not guilty, to conduct a hearing in aggravation and mitigation after conviction and prior to sentencing.

Other allegedly prejudicial circumstances are pointed out, including the fact that the defendant was injured by the police. It is not contended, however, that the defendant's treatment elicited any confession or admission, and it therefore has no bearing upon his guilt or innocence. We have examined the record and we find that the defendant's other charges of prejudice raise no question about the ultimate fairness of his trial or the sufficiency of the evidence to prove him guilty beyond a reasonable doubt.

The judgments of the criminal court of Cook County are affirmed.

*Judgments affirmed.*